UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION

TONZANIA RAYFORD,
individually and on behalf of situated persons

    Plaintiff,         Case No. 1:23-cv-13012

v.              Honorable Thomas L. Ludington
               United States District Judge

MOBILE PHLEBOTOMY OF CENTRAL
MICHIGAN, LLC (a/k/a MPCM SERVICES),
AMANDA BREASBOIS, an individual.
     Defendants.
_____/

## OPINION AND ORDER (1) GRANTING PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT, (2) DENYING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT, (3) AND DENYING PLAINTIFFS' MOTION *IN LIMINE* AS MOOT

On November 29, 2023, Plaintiffs—a group of phlebotomists providing services to mid-Michigan hospitals—sued Defendants Mobile Phlebotomy of Central Michigan (MPCM) and Amanda Breasbois, MPCM's owner, for unpaid overtime compensation required by the Fair Labor Standards Act (FLSA). Defendants counter that Plaintiffs were, in fact, independent contractors, not employees, and thus are not entitled to overtime pay.

As explained below, because Plaintiffs are employees, the Plaintiffs' Motion for Summary Judgment is granted, Defendants' Motion for Summary Judgment is denied, and Plaintiffs' Motion *in Limine* is denied as moot.

### I.

### A. Background

Defendants Mobile Phlebotomy of Central Michigan (MPCM) and Amanda Breasbois, MPCM's owner, contract with phlebotomists to provide blood collection-related services to hospitals and healthcare providers throughout mid-Michigan. ECF No. 9 at PageID.32. Plaintiffs

Tonzania Rayford, De'Zandria King, Molly Kroening, Kaleigh Sobanski, Jason Hoppe, Swadhyaya Broom, Camille Gonzales, Tyreisha Hargrow, Asia Davis, Rachel Harbaugh, Nicole Hoestine, Lakeya Jackson, and Kraige Osborn are among those phlebotomists.

Plaintiffs each began working for Defendants at different times and for varying periods, from around 2022 to 2023. *See* ECF No. 54 at PageID.1360. But all Plaintiffs signed an "Independent Contractor Staffing Agreement" (the "Agreements") as part of their employment with Defendants. ECF Nos. 54-17, 54-8, 54-26, 54-6. Much of the relevant information about Plaintiffs' jobs and Defendants' business is expressly addressed by these Agreements.

To begin, the Agreements contemplate Plaintiffs' term with Defendants. Plaintiffs' term with Defendants expired after one year of work. ECF No. 42-2 at PageID.1399. Each Plaintiff had the option to resign before their contract expired. *See* ECF No. 54-8 at PageID.1434. Still, at least one Plaintiff continued working for the Defendant for multiple years. *See* ECF No. 54 at PageID.1360.

The Agreements also partially addressed Plaintiffs' credentials. The state of Michigan does not require phlebotomists to earn a certificate to begin practicing,[1] ECF No. 54-2 at PageID.1404. And Defendant Breasbois required phlebotomists to obtain their phlebotomy certificate only if a

---

[1] While the state of Michigan does not require one be a Certified Phlebotomy Technician (CPT), *see* ECF No. 54-13 at PageID.1464, to practice as a phlebotomist, it is generally recommended to prospective phlebotomy employees that they obtain some form of certification to improve employment prospects. Marcella Sanchez, *Phlebotomy Schools in Michigan*, PHLEBOTOMYTRAINING, (May 9, 2025), https://www.phlebotomytraining.org/state/michigan/ [https://perma.cc/9FDT-S6M3]. For eligibility to attempt the phlebotomy certification exam, a person must possess a high school diploma or GED/high school equivalency, be eighteen years or older, be legally able to work within the United States, and complete a certain number of required classroom and laboratory hours. *How to Become a Phlebotomist in Michigan*, HEARTTOHEART, (Nov. 23, 2029), https://h2hhealth.com/how-to-become-a-phlebotomist-in-michigan/ [https://perma.cc/3MYS-UBWY].

hospital with which she had a contract required it. *Id.* The Agreements appear to make no mention of Plaintiffs' actual certification status. *See generally* ECF Nos. 54-8; 54-17; 54-26.

The Agreements further reflect that Plaintiffs' work schedules were largely within their control. ECF No. 54-8 at PageID.1429. The healthcare providers who needed assistance would inform Defendants in advance. ECF No. 54-2 at PageID.1394. It would then be communicated to the phlebotomists. *Id.* After that, the phlebotomists would inform MPCM of their availability, and the phlebotomy schedule with this health care provider would be confirmed. *Id.* The Plaintiffs' vacation or inability to work on a particular day would be considered when creating the schedule. *Id.* at PageID.1395. But once the schedule was established, if the Plaintiffs needed to take a day off, they had to arrange alternate coverage themselves and contact Defendants with the name of the other phlebotomist who would provide coverage. ECF No. 54-8 at PageID.1429, 1432; ECF No. 54-2 at PageID.1395. Under the Agreements, Plaintiffs were required to work at least 8 hours per week and at least 1 weekend per month. ECF No. 54-8 at PageID.1429.

As for pay, Plaintiffs were paid by Defendants either via check or direct deposit, bi-weekly, for hours through "work level 1 or 2."[2] ECF No. 54-8 at PageID.1428, 1435. Plaintiffs could also work on holidays. *Id.* at PageID.1435. While Plaintiffs could negotiate their hourly rate when they were hired, the pay scale was established for the term of the contract. ECF No. 54-2 at PageID.1404. Plaintiff Rayford's Agreement, for example, indicates that "time worked is recorded through a clock in/out program" and that she needed to "clock in/out for each shift [she] work[ed]," although this practice could change. ECF No. 54-8 at PageID.1431.

---

[2] Plaintiffs were paid more for working later shifts categorized as "level 2," versus the day shift, which is categorized as "level 1." *See* ECF No. 54-8 at PageID.1435.

Additionally, the Agreement provides that "[w]hen being trained with a MPCM Team member the new Independent Contractor will be paid a straight $20/hr, once they are fully trained and working on their own then they will be paid by the pay shift levels." ECF No. 54-8 at PageID.1435. But the Agreement is unclear about the training MPCM provided to new phlebotomists. The best indication comes from Defendant Breasbois' testimony:

> Everyone that wanted to was allowed to help train. *And I use the word "train" as, like, at any time someone was new, they came into the hospital, because of the policies and computer systems, they had to be shown where to go to the bathroom, where the break room was, where to park . . . .*
>
> And I made sure that, you know, I gave them like $50 to do that for, like training or something, just to kind of be thankful that, you know, I don't have to personally come in and do that . . . .

ECF No. 54-2 at PageID.1401 (emphasis added). Additional non-MPCM training may have been provided on-site by particular health care providers and their staff. *See* ECF No. 52 at PageID.1087.

Plaintiffs' agreements contain three separate subsections on dress codes related to (1) how their hair could be worn, (2) the fact that they needed to wear an MPCM Services-approved uniform, and (3) that their pants needed to clear the floor. As to the uniform, Defendant Breasbois testified that she provided each phlebotomist working for her with two pairs of uniforms with the company's logo. ECF No. 54-2 at PageID.1402. Indeed, Defendant Breasbois testified that it was her goal that no worker should have to spend any money to begin working at a hospital the company contracted with:

> They shouldn't have to spend anything. My job—my goal was to have them be ready to go day one. And if they wanted to, you know, get more scrubs so they didn't have to wash their clothes every day, then that was on them. But they didn't have to bring a dime and they could just show.

*Id.* at PageID.1404.

- 4 -

The Agreement also contemplated general behavioral standards. It required Plaintiffs not to use their phones while working, ECF No. 54-8, although Defendant Breasbois contends that this policy was only enacted because the hospital providers requested it. ECF No. 54-2 at PageID.1393. And the agreement language suggests that the Plaintiffs "keep friendships to a minimum with NON-MPCM Services team members" and clarifies that they are "there to be a worker not to socialize." ECF No. 54-8 at PageID.1429. Moreover, Plaintiffs could be drug screened "at the office location." *Id.* at PageID.1434.

Defendants had the right to terminate Plaintiffs' contract and had terminated at least one employee in the past. *See* ECF No. 54-2 at PageID.1410. Plaintiffs could choose to quit working for Defendants, but they were required to give two weeks' written notice. ECF No. 54-8 at PageID.1434. The contract provides that "[w]ithout a 2 week notice you will be fined a Termination Contract Fee, which is to be determined by MPCM's Service's Legal Advisor from your last pay period worked." *Id.* But Defendants have not charged a contract termination fee when they could have. ECF No. 52 at PageID.1084.

Finally, Plaintiffs' agreements with Defendants include both a non-compete agreement, ECF No. 54-8 at PageID.1440, and a non-disclosure agreement. *Id.* at PageID.1437. Both provisions are effective for five years. *Id.* at PageID.1440, 1437. The non-compete agreement confirms that the geographical scope of the agreements is the entire state of Michigan, *id.* at PageID.1440, applies to all "products, services, content, or duties that engage in any other way or version of representation of any other business of a similar nature to the owner." *Id.* at 1441. The

non-compete agreement further provides that the phlebotomists were not allowed to associate with *any* of MPCM's competitors or customers.[3] *Id.*

### B. This Case

On October 9, 2023, Plaintiff Rayford filed this Fair Labor Standards Act (FLSA) collective action in the United States District Court for the Western District of Michigan, alleging Defendants failed to adequately pay Plaintiff and similarly situated phlebotomists for overtime work. *See Rayford v. Mobile Phlebotomy of Central Michigan LLC*, CN 23-CV-01067 (W.D. Mich. 2023); ECF No. 1. Importantly, the employment contracts signed by Defendants and their phlebotomists classified the phlebotomists as "*independent contractors*" rather than *employees. See* ECF No. 10 at PageID.201 (emphasis added). Plaintiff's Complaint, however, alleges this was a misclassification because (1) the nature of the services that the phlebotomists perform and the way they perform these services, and (2) the way MPCM managed the phlebotomists, make it clear that they are employees for the purposes of the FLSA. ECF No. 1 at PageID.4. Thus, she would be entitled to overtime pay. As a result, Plaintiffs only assert one narrow claim, which turns on whether the phlebotomists were employees or independent contractors: unpaid overtime in violation of the FLSA. *Id.* at PageID.5.

In November 2023, the Parties stipulated to transfer the case from the Western District of Michigan to this Court for convenience. They noted that both Defendants reside in Saginaw

---

[3] In Plaintiff Rayford's non-compete agreement, both the box for "All Customers" and the box for "Specific Customers" were checked. ECF No. 54-8 at PageID.1441. Further, these non-compete agreements were also a part of state court litigation between Defendants and at least one of the Plaintiffs, which was seemingly settled. *Mobile Phlebotomy of Central Michigan LLC v. Covenant Healthcare Inc., et. al.*, 23-001724-CB (10th Cir. Ct. Saginaw Cnty., Mich); *see also* Cole Waterman, *Lawsuit Alleges Covenant HealthCare Poached Phlebotomists with Non-compete Contracts,* MLIVE, (Oct. 6, 2023) https://www.mlive.com/news/saginaw-bay-city/2023/10/lawsuit-alleges-covenant-healthcare-poached-phlebotomists-with-non-compete-contracts.html.

County, and the "vast majority" of Defendant MPCM's 32 phlebotomists live in this District. ECF Nos. 12; 13; *see also* ECF No. 9-9 at PageID.83, 92–93.

Once transferred, Plaintiff filed notice of four opt-in Plaintiffs: De'Zandria King, Molly Kroening, Kaleigh Sobanski, and Jason Hoppe. ECF No. 5. On December 12, 2023, Plaintiff filed a Motion for Supervised Notice Pursuant to 29 U.S.C. § 216(b).[4] ECF No. 9. On April 3, 2024, the Court granted Plaintiff's Motion for Supervised Notice and instructed Defendants to provide Plaintiff the names, last known postal address, and last known email address of the "putative FLSA collective." ECF No. 14 at PageID.338. Plaintiff was then instructed to send, at her expense, a Notice and Consent Form to all identified members of the FLSA collective. *Id.* An "opt-in" period for the collective terminated on July 22, 2024. *Id.* at PageID.339. Lastly, Plaintiff was directed to file notice of all Opt-In Plaintiffs with the Court on a rolling basis. *Id.*

Plaintiff did just that. In addition to the four previous Opt-In Plaintiffs (King, Kroening, Sobanski, Hoppe), who filed their consent forms with the Court on December 1, 2023, ECF No. 5, several other Plaintiffs opted in. On April 30, 2024, Swadhyaya Broom, Camille Gonzales, Tyreisha Hargrow, Asia Davis, Rachel Harbaugh, and Nicole Hoestine filed their Opt-In consent forms with the Court. ECF No. 21. On May 7, 2024, De'Zandria King[5] and Lakeya Jackson filed

---

[4] FLSA provides employees with a right of action to sue an employer for alleged violations, both individually and on behalf of similarly situated employees. 29 U.S.C. § 216(b). But "[n]o employee shall be a party . . . to any such action unless he gives his consent in writing to become such a party and such consent is filed in the court in which such action is brought." *Id.* Thus, "assuming they are 'similarly situated'—other employees become parties to an FLSA suit only if they affirmatively chose to do so." *Clark v. A&L Homecare & Training Ctr., LLC*, 68 F.4th 1003, 1007 (6th Cir. 2023). Although plaintiffs normally "come to the courts, rather than vice versa[,]" the Supreme Court has interpreted the FLSA to grant federal courts an "implied judicial power, in appropriate cases, to facilitate notice of FLSA suits to potential plaintiffs." *Id.* (internal quotations omitted) (citing *Hoffmann-La Roche v. Sperling*, 493 U.S. 165, 170 (1989)).

[5] King appears to have filed two Opt-In consent forms with the Court. *See* ECF Nos. 5; 27.

their Opt-In Consent forms. ECF No. 27. Kraige Osborn filed the final Opt-In consent form on July 10, 2024. ECF No. 43.

But several of the Opt-In Plaintiffs have since opted out. On May 8, 2024, Hoppe withdrew his consent form. ECF No. 29. On October 3, 2024, Broom, Hoenstine, and Hargrow all withdrew their consent forms. ECF No. 49. The next day, Davis, Gonzales, Harbaugh, and Osborn withdrew their consent forms. ECF No. 50. The following day, King withdrew her consent form. ECF No. 51. These withdrawals left only four Plaintiffs: named Plaintiff Rayford, and Opt-In Plaintiffs Sobanski, Kroening, and Jackson. ECF No. 52 at PageID.1077.

On October 16, 2024, Defendants moved for summary judgment. ECF No. 52. Plaintiffs responded on October 21, 2024, with a cross-motion for summary judgment. ECF No. 54. On November 13, 2024, Plaintiffs moved to bar Defendants from producing prejudicial evidence. ECF No. 58.

## II.

A motion for summary judgment should be granted if the "movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). The moving party has the initial burden of identifying where to look in the record for evidence "which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The burden then shifts to the opposing party who must set out specific facts showing "a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986) (citation omitted). The Court must view the evidence and draw all reasonable inferences in favor of the non-movant and determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Id.* at 251–52.

In reviewing cross-motions for summary judgment, courts must apply the proper standard of review for each motion and may not "treat the case as if it was submitted for final resolution on a stipulated record." *Ohio State Univ. v. Redbubble, Inc.*, 989 F.3d 435, 442 (6th Cir. 2021) (quoting *Taft Broad. Co. v. United States*, 929 F.2d 240, 248 (6th Cir. 1991)); *EMW Women's Surgical Ctr., P.S.C. v. Beshear*, 920 F.3d 421, 425 (6th Cir. 2019) ("[W]here, as here, the parties filed cross-motions for summary judgment, 'the court must evaluate each party's motion on its own merits, taking care in each instance to draw all reasonable inferences against the party whose motion is under consideration.'" (quoting *McKay v. Federspiel*, 823 F.3d 862, 866 (6th Cir. 2016)) (internal quotation marks omitted)).

### III.

Congress enacted "the FLSA with broad remedial intent." *Keller v. Miri Microsystems LLC*, 781 F.3d 799, 806 (6th Cir. 2015); *see Powell v. U.S. Cartridge Co.*, 339 U.S. 497, 509–11, 515 (1950). It "was designed to correct 'labor conditions detrimental to the maintenance of the minimum standard of living necessary for health, efficiency, and general well-being of workers.'" *Dunlop v. Carriage Carpet Co.*, 548 F.2d 139, 143 (6th Cir. 1977) (quoting 29 U.S.C. § 202(a)). Indeed, the FLSA "represents the New Deal's rejection of *Lochner v. New York*, 198 U.S. 45 (1905), and its doctrine of freedom of contract." *Imars v. Contractors Mfg. Servs., Inc.*, No. 97–3543, 165 F.3d 27, 1998 WL 598778, at *5 (6th Cir. Aug. 24, 1998). So the FLSA was created not only to protect employees from employers but also from *themselves*. *Id.* Because of the FLSA's broad remedial intent, "[c]ourts interpreting the FLSA must consider Congress's remedial purpose." *Keller*, 781 F.3d at 806 (citing *Lilley v. BTM Corp.*, 958 F.2d 746, 750 (6th Cir. 1992)).

The FLSA requires that employees who work more than 40 hours per week be paid overtime at a rate not less than 1.5 times their regular rate for each hour worked over that threshold. 29 U.S.C. § 207(a)(1). Employers who violate this requirement may be held liable for the

employee's unpaid overtime compensation and an equal number of liquidated damages. 29 U.S.C. § 216(b). Independent contractors are not entitled to the FLSA's protections. *Keller* 781 F.3d at 806 (citing *Rutherford Food Corp. v. McComb*, 331 U.S. 722, 729 (1947). But the Supreme Court has recognized that businesses are still liable to workers for overtime wages even if the company "'put[s] . . . an 'independent contractor' label' on a worker whose duties 'follow[ ] the usual path of an employee.'" *Id.* at 807 (quoting *Rutherford*, 331 U.S. at 729). Thus, the inquiry is whether Plaintiffs have been misclassified as independent contractors when, in practice, they are employees under the FLSA.

Under the FLSA, the term "employee" means any individual employed by the employer. 29 U.S.C. § 203(e)(1). Under the FLSA, "[e]mploy" includes to suffer or permit to work. *Id.* § 203(g). The Sixth Circuit has established an "economic reality" standard such that "employees are those who as a matter of economic realty are dependent upon the business to which they render service." *Keller*, 781 F.3d at 806 (citation modified). To determine whether a person is an employee under the economic-reality test, the Sixth Circuit has identified six factors: (1) "the permanency of the relationship between the parties"; (2) the degree of skill required" to render the services; (3) "the worker's investment in equipment or materials for the task"; (4) "the worker's opportunity for profit or loss, depending upon his skill"; (5) "the degree of the alleged employer's right to control the" way "the work is performed"; and (6) "whether the service rendered is an integral part of the alleged employer's business." *Id.* (citing *Donovan v. Brandel*, 736 F.2d 1114, 1117 & n. 5 (6th Cir. 1984)).

No single factor is dispositive. *Id.* And the central question is the level of "the worker's economic dependence upon the business for which he is laboring." *Brandel*, 736 F.2d at 1120. Therefore, each factor must be addressed in turn. Further, "whether a relationship is an

employment relationship is a question of law based on the totality of the circumstances." *Dep't of Lab. v. Americare Healthcare Servs., LLC*, 762 F. Supp. 3d 666, 680 (S.D. Ohio 2025); *see Fegley v. Higgins*, 19 F.3d 1126, 1132 (6th Cir. 1994)). "Only if the factors are in 'equipoise' should the question be put to the trier of fact." *Id.* (quoting *Imars*, 1998 WL 598778, at *6 (6th Cir. Aug. 24, 1998)).

### A. Economic Reality Test

### 1. Permanency of the Relationship

The first factor is permanency, which looks to the "length and regularity of the working relationship between the parties." *Keller*, 781 F.3d at 807 (citation omitted).

The more extensive the permanency of the Plaintiffs' relationship working for Defendants, the greater the evidence that they are employees. For starters, each Plaintiff worked for Defendants for several months, with the shortest period being Plaintiff Rayford, who worked for Defendant from October 2022 to April 2023—a total of seven months. ECF No. 54 at PageID.1360. Courts have held that as little as 6 months may be sufficient to determine that a person is an employee. *See LeMaster v. Alternative Healthcare Sols., Inc.*, 726 F. Supp. 2d 854, 861 (M.D. Tenn. 2010); *Brock v. Superior Care, Inc.*, 840 F.2d 1054, 1060–61 (2d Cir. 1988) (finding that nurses were employees even though 78% worked 13 weeks or less within the year). Some Plaintiffs worked for considerably longer periods, with Plaintiff Sobanski working for Defendants for several years. ECF No. 54 at PageID.1360.

Defendants cite *Donovan v. Brandel* in support of their argument. ECF No. 52 at PageID.1085. In *Brandel*, the Sixth Circuit assessed whether pickle harvesters were independent contractors or employees. 736 F.2d 1114. The court confirmed that the permanence factor indicated the harvesters were independent contractors, given that the pickle harvest lasted only 30 to 40 days.

*Id.* at 1117. Here, no Plaintiff worked for Defendant for less than six months; thus, *Brandel* is easily distinguishable.

But at least two of Plaintiffs worked multiple jobs. For instance, Plaintiff Kroening worked part-time for MidMichigan Hospital while working for Defendants, ECF 52 at PageID.1262, and Plaintiff Sobanski earned extra money as a digital content creator. *Id.* at PageID.1251. But the Sixth Circuit has explained that "'[e]mployees may work for more than one employer without losing their benefits under the FLSA.'" *Keller*, 781 F.3d at 808 (quoting *Brock v. Superior Care, Inc.*, 840 F.2d 1054, 1060 (2d Cir. 1988)). This fact matters most "when it suggests that a worker tends to 'transfer from place to place as particular work is offered.'" *Acosta v. Off Duty Police Servs., Inc.*, 915 F.3d 1050, 1058 (6th Cir. 2019) (quoting *Keller*, 781 F.3d at 807). The Sixth Circuit has acknowledged that working multiple jobs is common in contemporary cultural practices. *See Acosta v. Off Duty Police Servs., Inc.*, 915 F.3d 1050, 1058 (6th Cir. 2019) ("[W]hether a worker has more than one source of income says little about that worker's employment status. Many workers in the modern economy, including employees and independent contractors alike, must routinely seek out more than one source of income to make ends meet.").

Here, there is no evidence that either Plaintiffs Kroening or Sobanski "bounce[d] from one company to another in search of new work." *Acosta*, 915 F.3d at 1058. Rather, the record is clear that they consistently had two primary sources of employment, which the Sixth Circuit has already determined is not the "kind of itinerant work that independent contractors ordinarily perform." *Id.*

Finally, several courts have held that the existence of non-compete agreements also indicates that the relationship bears permanence. *See Chavez-Deremer v. Med. Staffing of Am., LLC*, 147 F.4th 371, 408 (4th Cir. 2025) ("[T]he non-compete clause in the Steadfast nurses' contracts limited their ability to work for other agencies. Apart from contradicting Steadfast's

assertion that its nurses purportedly moved between agencies with some regularity, this fact reinforces the existence of a permanent relationship"); *Perez v. Super Maid, LLC*, 55 F. Supp. 3d 1065, 1078 (N.D. Ill. 2014) (holding that a three-year non-compete agreement indicated an employer-employee relationship because it restricted the employee's ability to use their skills in the open market). Thus, the fact that Plaintiffs were required to sign a five-year non-compete agreement, too, is indicative of a permanent, albeit defined, employment relationship between the Parties. Thus, the permanency factor weighs heavily in favor of Plaintiffs being employees.

## 2. Degree of Skill Required for Rendering Services

The second factor is the degree of skill required to render services. The Sixth Circuit has clarified that what is important to the inquiry is "whether [Plainitiffs'] profits increased because of the 'initiative, judgment[,] or foresight of the typical independent contractor,' or whether [their] work "was more like piecework." *Keller*, 781 F.3d at 809 (quoting *Rutherford*, 331 U.S. at 730). Thus, "less complex work and a lower degree of skill is indicative of an employer-employee relationship." *Tassy v. Lindsay Ent. Enters., Inc.*, 591 F. Supp. 3d 191, 200 (W.D. Ky. 2022) "It is also important to ask how the worker acquired his skill." *Id.* An independent contractor is more likely to have gained the relevant skill through "formal education, an apprenticeship, or years of experience  . . . ." *Id.* "On the other hand, if the worker's training period is short, or the company provides all workers with the skills necessary to perform the job, then that weighs in favor of finding that the worker is indistinguishable from an employee." *Id.*

There is some evidence that Plaintiffs are skilled workers. While Defendant Breasbois testified that in Michigan it is not required that phlebotomists be certified to practice, and that she only requires her staff to be certified if a contracting health care provider requires it, ECF No. 54-2 at PageID.1404, most of the Plaintiffs were certified. *See* ECF No. 52 at PageID.1238, 1260; 58-

2 at PageID.1726. Additionally, it does not appear that Defendant paid for, or helped Plaintiffs locate a school to obtain their certificates. *See* ECF No. 54-2 at PageID.1391. While Plaintiffs had some degree of formal education as certified phlebotomists, Defendants did not pay for that training. Equally important, Defendants required Plaintiffs to be certified only if a contracting hospital did so. All in all, this factor weighs in favor of Plaintiffs being classified as independent contractors.

### 3. Plaintiffs' Investment in Equipment and Materials for the Task

The next factor concerns whether Plaintiffs must invest in the equipment or materials necessary to complete their tasks. The question is whether a worker has made a significant capital investment. *Keller*, 781 F.3d at 810. The Sixth Circuit has stated that "[t]he capital investment factor is most significant if it reveals that the worker performs a specialized service that requires a tool or application which he has mastered." *Brandel*, 736 F.2d at 1118-19. And "courts must compare the worker's investment in the equipment to perform his job with the company's total investment, including office rental space, advertising, software, phone systems, or insurance." *Keller*, 781 F.3d at 810 (citing *Hopkins v. Cornerstone Am.*, 545 F.3d 338, 344 (5th Cir.2008)).

Defendant Breasbois is the only one who invests in the business. Defendants provided Plaintiffs with two pairs of scrubs with the company's logo, which Defendant Breasbois testified was because her goal was to have her workers "be ready by day one" so that they "didn't have to bring a dime and they could just show." *Id.*; ECF No. 54-2 at PageID.1401. Defendants also paid for background checks if contracting hospitals required it. *Id.* at PageID.1403 ("[A]t Covenant I had to pay for a company that was called Vendor Mate, and it was like their background check…[s]o it was investing in that format, too.").

Defendants counter that Plaintiffs come to MPCM already trained and certified by third-party agencies to perform phlebotomy duties. ECF No. 52 at PageID.1082–83. But these facts do

not inform the analysis about Plaintiffs' investment because this factor relates to equipment, not training. *See Acosta*, 915 F.3d at 1056; *see also Keller*, 781 F.3d at 811 ("Thus, the record supports a finding that Keller and Miri invested capital *in the equipment, tools, and facilities* necessary for the satellite-dish-installation business. To the extent the record establishes that Keller made significant *capital investments in the equipment* he used on the job, it does so "weakly."") (emphasis added).

Defendants also argue that many of the hospitals where Plaintiffs worked provided the necessary supplies for Plaintiffs to perform their jobs. ECF No. 52 at PageID.1083. But the fact that another company supplied the Plaintiffs with necessary materials is not the same as Plaintiffs themselves providing a "significant capital investment." *Keller*, 781 F.3d at 810. Thus, this factor decisively favors Plaintiffs being employees.

### 4. The Plaintiffs' Opportunity for Profit or Loss

The next factor to consider is whether Plaintiffs had an opportunity for greater profits based on their management and/or technical skills. *Brandel*, 736 F.2d at 1119; *Keller*, 781 F.3d at 812. "Courts evaluate this factor by asking if workers 'could exercise or hone their *managerial skill* to increase their pay.'" *Acosta*, 915 F.3d at 1059 (quoting *Schultz v. Capital Int'l Sec., Inc.*, 466 F.3d 298, 308 (4th Cir. 2006) (emphasis added)). Defendants argue three reasons why Plaintiffs had control over their own profitability: (1) Defendants argue that they have no control over how many shifts become available from the health care providers they contract with; thus, they have no control over what profits are available to their workers, (2) the Plaintiffs control their own schedule and how much they work, and (3) Plaintiffs could negotiate with Defendants for a higher rate of pay. ECF No. 53 at PageID.1083. None of these arguments are convincing.

This factor pertains to whether *Plaintiffs* had an opportunity for greater financial reward based on their *management* or *technical skills*. *See Acosta*, 915 F.3d at 1059 (emphasis added).

Whether Defendants controlled how many hours the contracting health care providers needed is unrelated to Plaintiffs' management or technical skills. Nor can Plaintiffs contractually negotiate with employers for higher rates of pay. And while the court in *Acosta* noted that the ability to control one's schedule may, in certain situations, maximize net profits, it concluded that was not the case when workers were required to be present for set periods of time, regardless of the skills they exercised. *Id.* That is true here because, as Defendant Breasbois testified, no phlebotomist could make more or less money based on efficiency or performance. ECF No. 54-2 at PageID.1404.

Indeed, Defendants had the final say over Plaintiffs' compensation, ECF No. 54 at PageID.1365, and Plaintiffs' contracts included a standard hourly rate that varied depending on whether they worked an early shift, a late-night shift, or a holiday. *Id.* at PageId.1364. Because neither Plaintiffs' management nor technical skills could improve their income, this factor also favors them being employees.

**5. Degree of the Defendants' Right to Control the Manner in Which the Work is Performed**

The fifth factor is whether Defendants exercised control over Plaintiffs' work. The record reflects they did. Plaintiffs argue that Defendants carefully controlled their "appearance, conduct, worksite, and schedule." ECF No. 54 at PageID.1365. Indeed, Defendants largely controlled how the Plaintiffs performed their work under the signed agreements.

Plaintiffs' agreements contained three separate subsections addressing dress codes, including the fact that Plaintiffs needed to wear an MPCM Services-approved uniform. ECF No. 54-8 at PageID.1430. The agreement also required Plaintiffs not to use their phones while working. ECF No. 54-8. And the agreements suggested that the Plaintiffs "keep friendships to a minimum with NON-MPCM Services team members." ECF No. 54-8 at PageID.1429. Defendants had the right to terminate Plaintiffs' contract and had previously terminated workers. *See* ECF No. 54-2 at

PageID.1410. Plaintiffs could choose to quit working for Defendants but were required to submit a two-week notice in writing, without which they could be fined. ECF No. 54-8 at PageID.1434.

Defendants counter that many of these requirements were set by the contracting health care providers and implemented into Plaintiffs' agreements upon those providers' request, ECF No. 52 at PageID.1079–80.

But this factor considers "whether the [Defendants] 'retain[] the right to dictate the manner' of the worker's performance." *Acosta*, 915 F.3d at 1060 (6th Cir. 2019) (quoting *Brandel*, 736 F.2d at 1119). In *Brandel*, the Sixth Circuit held that this factor favored the pickle harvester Plaintiffs as independent contractors because the sharecropping arrangement "effectively relinquish[ed] control of the harvesting operation from [Defendant] to the migrant workers." 736 F.2d at 1119. The fact that Defendants may have put some of these policies in place at the request of contracting health care providers does not mean that they relinquished control to Plaintiffs. Rather, each of these policies in the Agreements is indicative of the fact that Defendants "retain[ed] the right to dictate the manner" of Plaintiffs' work. *Brandel*, 736 F.2d at 1119.

Defendants also argue that Plaintiffs controlled their own schedule. ECF No. 52 at PageID.1080. Plaintiffs respond that it is Defendants who controlled their schedule. ECF NO. 54 at PageID.1366. Even reading this fact in favor of Defendants, it is not dispositive that Defendants lacked control over Plaintiffs' work. *See Lilley v. BTM Corp.*, 958 F.2d 746, 750 (6th Cir. 1992) ("Although [Plaintiff] set his own hours and vacation schedule, such flexibility is not sufficient to negate control."); *see also Keller*, 781 F.3d at 813. And even though Plaintiffs supplied Defendants with their availability, ECF 54-2 at PageID.1394, they were still required to find coverage if their availability changed after the schedule was set. ECF No. 54-2 at PageID.1395. Moreover, Plaintiffs

had to wait for approval from Defendants before their time off would be approved. *See* ECF No. 54-21 at PageID.1502; *see also* ECF No. 54-22, PageID.1503.

Finally, the non-compete agreement Plaintiffs signed as part of their agreements with Defendants also indicates their control over Plaintiffs. In *Acosta*, the Sixth Circuit stated that the workers' two-year non-compete agreement revealed defendants' control because it limited the Plaintiffs' ability to locate other work. *Acosta*, 915 F.3d at 1060; *see also Benion v. LeCom, Inc.*, 336 F. Supp. 3d 829, 852 (E.D. Mich. 2018) (noting that defendants could terminate plaintiffs' contract for any reason and included a non-compete clause that limited the plaintiffs' ability to pursue similar work for six months after their relationship ended). Here, the Plaintiff's non-compete agreement is effective for five years and is geographically applicable to the entire state of Michigan. ECF No. 54-8 at PageID.1440. Defendants have already sued in one case to enforce their non-compete agreements. *See* Cole Waterman, *Lawsuit Alleges Covenant HealthCare Poached Phlebotomists With Non-compete Contracts*, MLIVE, (Oct. 6, 2023) https://www.mlive.com/news/saginaw-bay-city/2023/10/lawsuit-alleges-covenant-healthcare-poached-phlebotomists-with-non-compete-contracts.html. Thus, the non-compete agreements are an independent and important way that Defendants exercise control over Plaintiffs.

Overall, this factor weighs heavily in favor of Plaintiffs being employees.

### 6. Integral Part of the Business

The last factor asks whether the services provided by the Plaintiffs are integral to Defendants' business. *Acosta*, 915 F.3d at 1055. "The more integral the worker's services are to the business, the more likely it is that the parties have an employer-employee relationship." *Keller*, 781 F.3d at 815. The only services Defendants provide are phlebotomy services to local hospitals

and healthcare centers, and there is no dispute that Plaintiffs' services comprise the entire essence of Defendants' business model. ECF No. 54 at PageID.1381. Thus, this factor also cuts heavily in favor of Plaintiffs being employees.

### 7. Balance of Factors

On balance, five of the six factors indicate that Plaintiffs were employees of Defendants. The weight of the factors must be "balanced in light of the FLSA's 'strikingly broad' definition of 'employee.'" *Acosta*, 915 F.3d at 1050 (quoting *Keller*, 781 F.3d at 804). The Sixth Circuit has stated that, in balancing, courts should remain mindful of the Supreme Court's instruction to avoid "a 'narrow, grudging' interpretation of the FLSA" and "to remember its 'remedial and humanitarian' purpose." *Id.* (quoting *Monroe v. FTS USA, LLC*, 860 F.3d 389, 403 (6th Cir. 2017)) (cleaned up). To accomplish this purpose, courts must account for the full range of factors relevant to a worker's employment status. *Id.* Here, the range of factors indicates that Plaintiffs are employees entitled to overtime pay under the FLSA, and their Motion for Summary Judgment, ECF No. 54, is granted. Defendants' Motion for Summary Judgment, ECF No. 52, is denied.

### B. Defendants' Alternative Arguments

Defendants offer three additional arguments in their defense: (1) that Plaintiffs themselves believed they were independent contractors upon signing their agreements, ECF No. 52 at PageID.1085; (2) that, if Plaintiffs were the employees of anyone, they were the employees of the health care providers that Defendants contracted with; and that those health care providers are necessary parties under Rule 19 of the Federal Rules of Civil Procedure, *id.* at 1086; and (3) that Plaintiff Kroening comes to the Court with "unclean hands", so she should be dismissed as a Plaintiff, *id.* at PageID.1085. None of these arguments is persuasive.

First, Defendants argue that all Plaintiffs initially agreed that they were independent contractors when they signed their agreements. *Id.* at PageID.1085–86. But the Sixth Circuit has

already rejected contractual terms designating the relationship as an independent contractor as a dispositive factor in applying the economic realities test. *Imars*, 1998 WL 598778, at *5. Thus, whether the Plaintiffs originally agreed to be independent contractors upon signing their agreements with Defendants is of little import as to whether Plaintiffs are employees and entitled to overtime pay under the FLSA.

Next, Defendants argue that Plaintiffs were employees of the various healthcare providers for which they performed phlebotomy services, not Defendants. ECF No. 52 at PageID.1088. Defendants argue that Plaintiffs have failed to join the health care providers as necessary parties to this lawsuit under FED. R. CIV. P. 19.[6] But the Court has already determined that Plaintiffs were employees of Defendants. And, even if Plaintiffs were also employees of the health care providers, "[m]ore than one 'employer' can be simultaneously responsible for FLSA obligations." *Reyes-Trujillo v. Four Star Greenhouse, Inc.*, 513 F. Supp. 3d 761, 779 (E.D. Mich. 2021) (citation omitted). Moreover, other district courts have held that where plaintiffs state a FLSA claim against a defendant alleged to be their employer, an unnamed co-employer is not a necessary party to be joined under Rule 19(a). *See, e.g., Kearney v. Home Depot USA, Inc.*, No. CV 17-5806, 2018 WL 11488155, at *3 (E.D. La. July 16, 2018) *Niven v. E-Care Emergency McKinney*, LP, No. 14-494, 2015 WL 1951811 at *2, 2015 U.S. Dist. LEXIS 46768 at *6 (E.D. Tex. April 10, 2015); *Iraheta v. Lam Yuen*, LLC, No. 12-1426, 2012 WL 5995689 at *5, 2012 U.S. Dist. LEXIS 169901 at *17 (D. Md. Nov. 29, 2012); *Azamar v. Stern*, 662 F. Supp. 2d 166, 177 (D.D.C. 2009); *DeWitt v. Daley*,

---

[6] Civil Rule 19(a) provides: "A person who is subject to service of process and whose joinder will not deprive the court of subject-matter jurisdiction must be joined as a party if: (A) in that person's absence, the court cannot accord complete relief among existing parties; or (B) that person claims an interest relating to the subject of the action and is so situated that disposing of the action in the person's absence may: (i) as a practical matter impair or impede the person's ability to protect the interest; or (ii) leave an existing party subject to a substantial risk of incurring double, multiple, or otherwise inconsistent obligations because of the interest." FED. R. CIV. P. 19(a).

336 B.R. 552, 556 (S.D.Fla.2006); *Yates v. Applied Performance Techs., Inc.*, 209 F.R.D. 143, 149 (S.D.Ohio 2002). Thus, the Court need not decide whether the health care providers were also Plaintiffs' employers, and Defendants' joinder arguments under Civil Rule 19(a) lack merit.

Lastly, Defendants argue that Plaintiff Kroening should be dismissed from the case as a Plaintiff because she "comes to the Court with *unclean hands*." ECF No. 52 at PageID.1085 (emphasis added). Defendants point to Plaintiff Kroening's deposition, in which she admitted that she did not report any income from MPCM to the Internal Revenue Service and that she did not disclose income from MPCM when she applied for government benefits. *Id.*

But the doctrine of unclean hands is an equitable doctrine that allows the Court to deny injunctive or declaratory relief. *Cyber Sols. Int'l, LLC v. Pro Mktg. Sales, Inc.*, 634 F. App'x 557, 567 (6th Cir. 2016). Plaintiffs seek monetary damages for unpaid overtime in violation of the FLSA, not injunctive relief. See ECF No. 1 at PageID.6. And to the extent that Plaintiff Kroening seeks injunctive relief, the doctrine of unclean hands only permits courts to *deny* that type of relief, not *dismiss* Plaintiff Kroening's claims entirely. *See Cyber Sols. Int'l, LLC*, 634 F. App'x at 567 ("The doctrine of unclean hands is an equitable concept that allows a court to deny injunctive or declaratory relief").

It is only appropriate for the Court to deny injunctive relief under the doctrine of unclean hands if the plaintiff "is guilty of conduct involving fraud, deceit, unconscionability, or bad faith *related* to the matter at issue *to the detriment of the other party*." *Performance Unlimited, Inc. v. Questar Publishers, Inc.*, 52 F.3d 1373, 1383 (6th Cir. 1995) (quoting *Novus Franchising, Inc. v. Taylor*, 795 F. Supp. 122, 126 (M.D. Pa. 1992) (emphasis added)). Here, Defendants have not shown how Plaintiff Kroening's alleged fraudulent tax actions are detrimental to *them* as a party.

Thus, even if the Plaintiff Kroening were asking for injunctive relief, the doctrine of unclean hands would not apply.

## IV.

On November 13, 2024, Plaintiffs filed a Motion *in Limine* to Bar Defendants from Producing Prejudicial Evidence. ECF No. 58. But because Plaintiffs' Motion for Summary Judgment, ECF No. 54, will be granted, and because the only remaining question left to be addressed is damages, the Motion will be denied as moot. Thus, Plaintiffs' Motion *in Limine* is denied without prejudice.[7]

## V.

Accordingly, it is **ORDERED** that Plaintiffs' Motion for Summary Judgment as to liability, ECF No. 54, is **GRANTED**.

Further, it is **ORDERED** that Defendants' Motion for Summary Judgment, ECF No. 52, is **DENIED**.

Further, it is **ORDERED** that Plaintiffs' Motion *in Limine* to Bar Defendants from Producing Prejudicial Evidence, ECF No. 58, is **DENIED AS MOOT**.

**This is not a final order and does not close this case.**

Dated: December 29, 2025                         s/Thomas L. Ludington
                                                 THOMAS L. LUDINGTON
                                                 United States District Judge

---

[7] Plaintiffs are free to refile their Motion *in Limine* with an explanation as to how it applies to damage calculations.